# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **ANTONIO CUNNINGHAM,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | Civil Action Number: |
| **v.** | ) | **5:15-cv-1127-AKK** |
| | ) | |
| **WARDEN DEWAYNE ESTES,** *et* | ) | |
| *al.,* | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

Antonio Cunningham brings this action against Warden Dewayne Estes, Lieutenant Guy Noe, Sergeant Ray, Officer Randy Griffith, and Captain Smith, in their individual capacities, alleging violations of the Eighth Amendment based on their failure to protect him from another inmate. *See generally* docs. 1; 8. The court has for consideration Defendants' motion for summary judgment, doc. 37, which is fully briefed, docs. 37; 39, and ripe for review. For the reasons below, except for Warden Estes' motion, which is unopposed, doc. 39 at 1, the motion is due to be denied.

## I.    STANDARD OF REVIEW

Under Fed. R. Civ. P. 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law." To support a summary judgment motion, the parties must cite to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c). Moreover, "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Id*. at 323. The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish that there is a "genuine issue for trial." *Id*. at 324 (citation and internal quotation marks omitted). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party. *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970); *see also Anderson*, 477 U.S. at 255 (all justifiable inferences must be drawn in the non-moving party's favor). Any factual disputes will be resolved in the non-moving party's favor when sufficient

competent evidence supports the non-moving party's version of the disputed facts. *See Pace v. Capobianco*, 283 F.3d 1275, 1276 (11th Cir. 2002) (a court is not required to resolve disputes in the non-moving party's favor when that party's version of events is supported by insufficient evidence). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citation omitted). Furthermore, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citation omitted).

## II.    FACTUAL BACKGROUND

From 2011 to 2013, Cunningham shared a cell with Nakemah Grover at Limestone Correctional Facility in Harvest, Alabama. Doc. 1 at 1–3. During that time, Cunningham and Grover developed an "on-again, off-again" and "stormy" romantic relationship. *Id.* at 3; *see also* docs. 37-2 at 14; 39 at 2. Their relationship involved numerous disputes, some physical, and during which Grover openly threatened Cunningham's life. "Between September 6, 2012 and July 7, 2013, at least eight incidents involving physical violence, threats of physical violence, or both occurred between them." Doc. 1 at 3; *see* doc. 32-7 at 24, 29; *see also* docs. 32-7 at 25 (sometimes Grover choked Cunningham); 39-1 at 1 (Inmate Xavier

Johnson, states that "[he] witnessed at least two incidents in which . . . Grover and Cunningham had physical fights"); 39-1 at 3 (Inmate Roderick Hightower states that "[he] saw several physical fights, as well as arguments, between them").

The first incident relevant to this lawsuit occurred on September 6, 2012, when an argument between Cunningham and Grover escalated into a physical struggle that required other inmates to restrain Grover. Docs. 1 at 3; 37-2 at 23, 25. The scuffle landed both in Captain Smith's office, docs. 1 at 3; 37-2 at 23, 25, where they began arguing again, and in Captain Smith's presence, Grover threatened to "cut [Cunningham's] head off," doc. 37-2 at 25. Later that day, Cunningham asked Captain Smith to move him from the cell he shared with Grover. Doc. 37-2 at 25. Captain Smith refused and sent Cunningham instead to lockup (segregation), saying "Shut up, you fucking faggot," "[y]ou want to go to lockup?" and "[g]o pack your shit. Go to lockup." *Id.* at 23, 25.

After his release from segregation, the prison returned Cunningham to the cell he shared with Grover. *Id.* To no surprise, the friction between the two men continued, and a series of incidents between October 3 and December 11, 2012, led to Cunningham and Grover having to sign peace agreements, indicating that they could live together without incident. *See* docs. 37-3; 37-5; 37-6. Cunningham explains that he signed the agreements reluctantly because the only alternative the officers offered was the segregation "lockup." Doc. 37-2 at 20.

A conflict in January 2013 led Grover to hide a weight bar in the cell to use to "bust [Cunningham's] brains out" one night. Docs. 1 at 4; 37-2 at 10–11. The prison confiscated the weight bar when two other inmates reported Grover's plan to Lieutenant Noe.[1] Docs. 1 at 4; 37-2 at 10–13. As a result, officers took Grover and Cunningham to Lieutenant Noe, who instructed Sergeant Ray to "[s]eparate their ass" and "[m]ake sure they don't have [any] contact with each other." Doc. 37-2 at 13; *see also id.* at 10; doc. 1 at 4. However, Sergeant Ray disregarded the directive and returned Cunningham and Grover to their shared cell. Docs. 1 at 4; 37-2 at 10.

To show his displeasure over the disclosure of his plan to bludgeon Cunningham, Grover physically confronted Cunningham and the two inmates he blamed for reporting him. Doc. 37-2 at 12. Relevant here, Grover argued with Cunningham in their cell, pushed Cunningham "against the wall," and struck Cunningham with his fist. *Id.* at 13. Cunningham pushed and hit Grover back, and then ran to the gym. *Id.* Ultimately, the four inmates signed a peace agreement, indicating that they could live together in B Dorm "without violence existing between [them]." Doc. 37-4.

---

[1] Although Lieutenant Noe is now a captain, *see* doc. 1 at 2, the court will use the title he held during the events in this lawsuit.

Sometime in the spring of 2013, Cunningham ended the relationship, telling Grover that he "wanted to separate from him, because . . . [Grover] was beginning to scare [Cunningham]." Doc. 37-2 at 14. As Cunningham describes it, he feared Grover, because "as [they] got into the relationship, [Grover] got violent." *Id.* at 16. After ending the relationship, Cunningham "began the process of writing a request to be separated from [Grover]." *Id.* at 14. Unfortunately, as is sometimes the case with abusive partners, Grover's physical threats escalated after the break up. *See id.* at 14–16, 26; doc. 39-1. One inmate recalls that "[a]fter the relationship between them ended, there developed hostility" between Cunningham and Grover. Doc. 39-1 at 4. In fact, soon thereafter, an altercation landed Cunningham and Grover in segregation. Doc. 39 at 2. When they returned to general population, Sergeant Ray placed them in separate cells, albeit in the B Dorm, which meant that "they [still] had daily access to each other." *Id.* at 3; *see also* doc. 39-1 at 3. To ensure his safety, Cunningham told the dorm and shift officers that he was "tired of being bothered by Grover," and wanted to be in a different dorm. Doc. 39-1 at 3–4.

On April 13, 2013, during an altercation in front of Captain Smith's office that required the intervention of other inmates, Grover threatened to kill Cunningham. Docs. 1 at 4; 37-2 at 26. In response, the officer on duty — Officer Moore — separated Cunningham and Grover for a period of time that day. Doc. 37-2 at 26. Sometime that day, Grover sent a request to Officer Moore for the

prison to separate him from Grover. *Id.*; *see also* doc. 39-1 at 1. After discussing Cunningham's request with Captain Smith, Officer Moore told Cunningham that Captain Smith "couldn't move [Cunningham], and that he wasn't going to place [Cunningham] in C Dorm, because the C Dorm . . . was for . . . the elders, or the only dorm or something, and [Cunningham] had disciplinaries so [he] couldn't be placed over there." Doc. 37-2 at 26. Officer Moore communicated with Captain Smith again about the transfer request, but to no avail. *Id.*; *see also* doc. 39-1 at 1.

Later that night, Grover attempted to attack Cunningham with a razor in the shower. Doc. 37-2 at 14–15, 17. As Cunningham showered, Grover tried to approach Cunningham twice. *Id.* at 17. After Cunningham informed Grover on both occasions that he did not want to speak to him, Grover returned a third time with a double-blade razor (broken in half), stating "Bitch, I'm fixing to cut your throat." *Id.* at 14–15, 17. This incident ended when "the officer in the cube," located four feet from the shower, "beat on the glass" and "told [Grover] to get away from the shower." *Id.* at 15. Cunningham later informed the officer, who had not seen the razor blade, that Grover had attempted to attack Cunningham with a razor. *Id.* at 15–17. The officer removed Grover from the shower area, and reported the incident to Lieutenant Noe, who instructed the officer to "lock [Grover's] ass" in his cell, which the officer did. *Id.* at 16–17.

The following day, Lieutenant Noe discussed the previous night's events, including the Cunningham-Grover situation, with Officer Howard, Lieutenant Pickens, and Sergeant Bragg. Doc. 37-2 at 26. During that discussion, Lieutenant Pickens "suggested that one, or both, be locked up until one was released for fear that one or both would be injured or killed." *Id.*; *see also* doc. 39-1 at 1 ("[Inmate Johnson] overheard Lt. Pickens tell Capt. Noe that, if [Cunningham and Grover] were not separated, one or both would be hurt or killed. Capt. Noe responded that he would not move them."). Despite this suggestion, Lieutenant Noe opted to keep Cunningham and Grover together in B Dorm, and to tell the two only that he did not want to hear anything else from them. *Id.*

The next incident occurred on June 10, 2013, when Cunningham and Grover were involved in a verbal altercation. This incident resulted in both signing another peace agreement, "agreeing that they can live together peacefully in [B Dorm] population with no further incident." Doc. 37-10. Like the other peace accords before it, this one also did not provide any relief for Cunningham. Instead, just three weeks later, on July 7, 2013, Grover slashed Cunningham's throat with a razor blade. Docs. 37-1; 39-1 at 2. Specifically, while Officer Randy Griffith was on dorm duty, Grover surprised Cunningham from behind in the communal space for B Dorm inmates, stating "Bitch, I'll cut your throat," and then slit Cunningham's throat with a razor. Doc. 37-2 at 4–5. The attack severed

Cunningham's carotid artery and jugular veins, requiring Cunningham to receive blood transfusions and to be airlifted to a hospital for surgery. *Id.* at 4.

Two days before this attack, inmate John F. Burton learned that Grover and another inmate were plotting to cut his and Cunningham's throats. Doc. 39-1 at 2. Burton reported this information to Officer Griffith, who said, "[w]hatever happens to you all homosexuals needs to happen. Now get away from this cage and me." *Id.*; *see also id.* at 4 (Inmate Hightower "recall[s that] Officer Griffith [did] make at least one offensive and disparaging comment about gays, but [he] do[es] not recall specifically what he said"). As a result, Officer Griffith took no action, and did not report the threat to anyone else. *Id.* at 2.

## III.  ANALYSIS

Cunningham alleges that Defendants violated his rights under the Eighth Amendment by acting with deliberate indifference to a substantial threat to his life. *See generally* docs. 1; 8; 39. Defendants seek summary judgment on qualified immunity grounds.[2] *See generally* doc. 37.

_____

[2] Defendants argue also that Cunningham cannot pursue vicarious liability claims against Sergeant Ray, Lieutenant Noe, or Captain Smith, because Cunningham has failed to sufficiently plead any supervisory liability. Doc. 37 at 11–12. It is not clear from the complaint, *see* docs. 1; 8, that Cunningham has asserted a vicarious liability claim. In any event, Cunningham failed to respond to this argument, *see generally* doc. 39, and, as such, has waived any vicarious liability claims he may have pleaded. *See Endsley v. City of Macon*, 321 F. App'x 811, 814 (11th Cir. 2008) (citing *Access Now, Inc. v. Southwest Airlines*, Co., 385 F.3d 1324, 1330 (11th Cir. 2004) ("a legal claim or argument that has not been briefed will be deemed abandoned").

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quotations omitted); *see also Mercado v. City of Orlando*, 407 F.3d 1152, 1156 (11th Cir. 2005). "Qualified immunity allows government employees to carry out their discretionary duties without fear of litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." *Mercado*, 407 F.3d at 1156 (quotations omitted). "'Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.'" *Case v. Eslinger*, 555 F.3d 1317, 1325 (11th Cir. 2009) (quoting *Pearson*, 555 U.S. at 231). Relevant here, qualified immunity protects officials from suit, not just from litigation; that is, if the claims against them can be resolved at the summary judgment phase, the court must do so. *See Pearson*, 555 U.S. at 231–32.

## A. Defendants Acted Within Their Discretionary Authority

To invoke qualified immunity, an officer "must . . . establish that he was acting within the scope of his discretionary authority." *Case*, 555 F.3d at 1325. Defendants assert that they easily clear this hurdle, because "[e]verything alleged

in [the] pleadings in this case describes Defendants as doing what correctional officials do." Doc. 37 at 10. To make this showing, Defendants "must show that th[eir] actions were (1) undertaken pursuant to the performance of [their] duties, and (2) within the scope of [their authority]." *Harbert Int'l, Inc., v. James*, 157 F.3d 1271, 1282 (11th Cir. 1998). "A bald assertion that the acts were taken pursuant to the performance of duties and within the scope of duties will not suffice." *Id.* (citation and quotations omitted). Rather, "[the] court must ask whether the act[s] complained of, if done for a proper purpose, would be within, or reasonably related to, the outer perimeter of an official's discretionary duties." *Id.* Specifically, "[t]he scope of immunity 'should be determined by the relation of the [injury] complained of to the duties entrusted to the officer.'" *Id.* (internal quotations omitted). Stated differently, rather than asking whether Defendants failed to act, or if their actions were unconstitutional, this court must ask instead whether the officers' individual duties included responding to a substantial threat on an inmate's life. *See id.* at 1282–83 (citation omitted). Therefore, because Cunningham concedes that such a response was, indeed, within the discretionary authority of the officers, *see* doc. 39 at 6, Defendants have satisfied the first prong.

## B. Cunningham Overcomes The Defense Of Qualified Immunity

In light of Defendants establishing that they acted within their discretionary authority, "[t]he burden shifts to [Cunningham] to overcome the defense of

qualified immunity." *Case*, 555 F.3d at 1325 (citation omitted). To do so, Cunningham must show that (1) Defendants violated a constitutional right and (2) that the right was clearly established at the time of the alleged violation. *Pearson*, 555 U.S. at 236; *Hope v. Pelzer*, 536 U.S. 730, 736–39 (2002). "[T]his two-pronged analysis may be done in whatever order is deemed most appropriate for the case." *Grider v. City of Auburn*, 618 F.3d 1240, 1254 (11th Cir. 2010).

To begin, Cunningham correctly states, *see* doc. 39 at 6, that the law clearly establishes that "prison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners" pursuant to the Eighth Amendment. *Farmer v. Brennan*, 511 U.S. 825 (1993); *Bowen v. Warden Baldwin State Prison*, 826 F.3d 1312, 1320 (11th Cir. 2016). After all, "[b]eing violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.'" *Farmer*, 511 U.S. at 834 (internal citation omitted).

Next, the court considers whether Defendants violated Cunningham's right to be protected from violence at the hands of other prisoners. Although prison officials have a duty to "take reasonable measures to guarantee the safety of the inmates," *Farmer*, 511 U.S. at 832 (citation and quotations omitted), "[not] every injury suffered by one prisoner at the hands of another . . . translates into constitutional liability for prison officials responsible for the victim's safety," *id.* at 834. A prison official only violates the Eighth Amendment "when a substantial risk

of serious harm, of which the official is subjectively aware, exists and the official does not respond reasonably to the risk." *Bowen*, 826 F.3d at 1320 (citation and quotations omitted). Stated differently, "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844.

Consequently, "[t]o survive summary judgment on [a] section 1983, Eighth Amendment claim, [a] [p]laintiff [is] required to produce sufficient evidence of (1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation." *Carter v. Galloway*, 352 F.3d 1346, 1349 (11th Cir. 2003). Because Defendants concede that a substantial risk of serious harm existed, *see* doc. 37 at 5, the court must decide only whether Cunningham has presented sufficient evidence to show deliberate indifference to a known, serious risk and causation. Doc. 39 at 5–9.

### 1. Deliberate Indifference

To prove deliberate indifference, Cunningham must show that Defendants: (1) subjectively knew that he faced a substantial risk of serious harm; and (2) disregarded that known risk by failing to respond in an objectively reasonable manner. *Bowen*, 826 F.3d at 1320. Subjective knowledge requires that a defendant "must both be aware of the facts from which the inference could be drawn that a

substantial risk of serious harm exists, and he must also draw the inference." *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1099 (11th Cir. 2014) (quoting *Farmer*, 511 U.S. at 837). "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Id.* at 1100 (internal quotations and citations omitted). "[I]t remains open to the officials to prove that they were unaware even of an obvious risk to inmate health or safety." *Farmer*, 511 U.S. at 844. Indeed, "[a]lthough notice of threats is certainly relevant, prison officials may not escape liability just because an injured inmate did not inform anyone that he was being threatened or that he faced an attack from another inmate." *Lane v. Philbin*, 835 F.3d 1302, 1308 (11th Cir. 2016). Put simply, "the failure to give advance notice is not dispositive. [Cunningham] may establish [Defendants'] awareness by reliance on any relevant evidence." *Farmer*, 511 U.S. at 848.

Here, Defendants argue that they are not liable because "there is no evidence that [Cunningham] told these Defendants about Grover and no evidence the [*sic*] any of these Defendants signed or had any knowledge about the Peace Agreements." Doc. 37 at 5. The record belies Defendants' contentions as to the subjective knowledge of the harm Grover posed and as to whether they responded reasonably to the known risk.

### a. Sergeant Ray

There is sufficient evidence for a jury to find that Sergeant Ray knew that Grover posed a substantial risk to Cunningham's safety. Specifically, in January 2013, after an incident in which Grover hid a weight bar in the cell he shared with Cunningham with the intent to "bust [Cunningham] upside the head," Lieutenant Noe instructed Sergeant Ray to separate Grover and Cunningham and to "[m]ake sure they don't have any contact with each other." Doc. 37-2 at 13. Sergeant Ray failed to follow this directive. *Id.* A few months later, after another altercation that landed both inmates in segregation, Sergeant Ray finally reassigned Cunningham and Grover to separate cells to address the threat. Docs. 37-2 at 16–17; 39 at 2–3. Based on this evidence, a reasonable jury could find that Sergeant Ray subjectively knew that Grover posed a substantial risk of serious harm to Cunningham.

As to whether Sergeant Ray responded reasonably to the known risk, although Sergeant Ray eventually moved Grover to another cell, he acted with no urgency or effectiveness. Specifically, despite Lieutenant Noe's instructions in January, 2013, Sergeant Ray failed to take even minimal steps to separate Cunningham and Grover. *See* docs. 1 at 4; 37-2 at 10. Moreover, when Sergeant Ray finally acted after a subsequent altercation, he only reassigned Grover to a separate cell in the same dorm and tier as Cunningham. Docs. 37-2 at 16–17; 39 at 2–3. By leaving Cunningham in the same tier of B Dorm as Grover, Sergeant Ray

ensured that both inmates continued to have "daily access to each other." Doc. 39 at 3. Given Sergeant Ray's knowledge of the violent history between Cunningham and Grover, and his failure to place Cunningham and Grover into different dorms, on different tiers of B Dorm, or to further limit their daily access to one another while living on the same tier, a reasonable jury could find that Sergeant Ray failed to act reasonably to protect Cunningham from the substantial risk of serious harm that Grover posed to him.

### b. Lieutenant Noe

There is sufficient evidence also for a jury to find that Lieutenant Noe knew that Grover posed a substantial risk to Cunningham. To start, Lieutenant Noe learned about Grover's plan in January 2013 to "bust [Cunningham's] brains out." Doc. 37-2 at 10–11. After this incident, Lieutenant Noe instructed Sergeant Ray to "[m]ake sure [Cunningham and Grover] don't have [any] contact with each other." *Id.* at 13. Moreover, a few months later, after receiving a report that Grover had attempted to attack Cunningham in the shower with a razor, Lieutenant Noe instructed the officer to "lock [Grover's] ass" in his cell. *Id.* at 16–17. The following day, Lieutenant Noe discussed the attack with fellow officers, during which another lieutenant "suggested [to Lieutenant Noe] that one, or both, be locked up until one was released [from prison] for fear that one or both would be injured or killed." *Id.* Based on this evidence, a reasonable jury could find that

Lieutenant Noe subjectively knew that Grover posed a substantial risk of serious harm to Cunningham.

As to whether Lieutenant Noe responded reasonably to the threat Grover posed, although Lieutenant Noe initially instructed Sergeant Ray in January 2013 to "[m]ake sure [Cunningham and Grover] don't have [any] contact with each other," *id.* at 10–11, 13, there is also evidence that he failed to ensure that Sergeant Ray complied with the directive and that he did not take the threat seriously. For example, a few months after he issued the directive to Sergeant Ray, after Grover attempted to slit Cunningham's throat with a razor in the shower, another lieutenant warned Lieutenant Noe to separate Grover and Cunningham indefinitely "for fear that one or both would be injured or killed." *Id.* at 26; doc. 39-1 at 1. Despite this suggestion, Lieutenant Noe refused to act — he failed to separate Cunningham and Grover into different dorms or tiers within B Dorm, place either in segregation, limit their interactions in the common areas of B Dorm, or restrict Grover's access to razors. *See* docs. 37-2 at 16–17, 26; 39 at 7; *see also* doc. 39-1 ("Noe responded that he would not move them."). Moreover, even if Lieutenant Noe believed that the actions he took — *i.e.*, first directing Sergeant Ray to separate Cunningham and Grover, and then directing another officer later to temporarily lock Grover in his cell — were sufficient steps, the ensuing statement by another lieutenant should have demonstrated that Grover remained a threat to

Cunningham. Based on Lieutenant Noe's refusal to implement preventative measures to protect Cunningham, a reasonable jury could find that Lieutenant Noe failed to act reasonably to protect Cunningham from the substantial risk of serious harm that Grover posed to him.

### c. Captain Smith

There is also sufficient evidence for a jury to find that Captain Smith knew that Grover posed a substantial risk to Cunningham's safety. As an initial matter, after Grover threatened to "cut [Cunningham's] head off," Captain Smith warned Grover that if he did not stop threating Cunningham, he would place Grover in disciplinary segregation. Doc. 37-2 at 23, 25. Despite this warning, the threats continued, including one in April 2013 in front of Captain Smith's office during which Grover threatened to kill Cunningham. After this incident, the officer on duty relayed Cunningham's request to Captain Smith for placement in another dorm. *Id.* at 26. Even after Captain Smith rejected the request — stating that he "couldn't move [Cunningham], and that he wasn't going to place [Cunningham] in C Dorm, because the C Dorm was for . . . the elders, or the only dorm or something, and [Cunningham] had disciplinaries so [he] couldn't be placed over there,"[3] *id.*, the officer approached Captain Smith again about the transfer request,

---

[3] There is no evidence in the record regarding whether the C Dorm was the only other dorm at the prison or if only the C Dorm had a vacancy. *See* doc. 37-2 at 26 (Cunningham stating that

*id.* Based on this evidence, a reasonable jury could find that Captain Smith subjectively knew that Grover posed a substantial risk of serious harm to Cunningham.

There is also evidence in the record for a jury to find that Captain Smith failed to respond reasonably to the threat. Specifically, when Cunningham asked Captain Smith to place him in a different cell and to separate him from Grover after Grover threatened to cut his head off, Captain Smith refused, directed a slur at Cunningham, and sent Cunningham instead to lockup (segregation): "Shut up, you fucking faggot," "[y]ou want to go to lockup?" and "[g]o pack your shit. Go to lockup." *Id.* Moreover, although Captain Smith subsequently cited the threat Grover may pose to the inmates in C Dorm as a reason for not moving Cunningham, *see id.* at 26, there is evidence in the record that other options may have been available. For example, Captain Smith may have had the option to separate them into different tiers of B Dorm or to further limit their daily access to one another while living in B Dorm. Although the court is sympathetic to the difficult task of running a prison, and to Captain Smith's legitimate need to protect

---

Captain Smith told him that he could not place Cunningham in C Dorm, because "C Dorm . . . was for . . . the elders, or the only dorm or something."). However, because Defendants present no argument or explanation contending the number of dorms, the number of available beds, why they could not have transferred Grover or Cunningham to those other dorms, if any, and because the court must construe the evidence and draw all reasonable inferences in the light most favorable to the non-moving party, *see Anderson*, 477 U.S. at 255; *Adickes*, 398 U.S. at 157, the court cannot infer from this record that Defendants had valid reasons for not considering the placement of Cunningham into other existing dorms.

the vulnerable elderly prisoners in C Dorm from Cunningham, Captain Smith has provided no explanation for why he could not have moved Cunningham to one of the other dorms in the prison, if any, *see supra* note 3, or why, at the very least, he could not have found ways to further limit Grover's access to Cunningham within B Dorm. Accordingly, a reasonable trier of fact could find that Captain Smith failed to act reasonably to protect Cunningham from the substantial risk of serious harm that Grover posed to him.

### d. Officer Griffith

There is also sufficient evidence for a jury to find that Officer Griffith knew that Grover posed a substantial risk to Cunningham's safety. As an initial matter, Officer Griffith's contention that Cunningham never notified him of Grover's plan, *see* doc. 37 at 5–6, is unavailing because "the failure [of Cunningham] to give advance notice [of the threat] is not dispositive. [Cunningham] may establish [Officer Griffith's] awareness by reliance on any relevant evidence." *Farmer*, 511 U.S. at 848. The relevant evidence here occurred just two days before Grover slit Cunningham's throat, when inmate Burton notified Officer Griffith about Grover's plot. Doc. 39-1 at 2. Burton's report is sufficient to establish awareness, especially where, as here, Officer Griffith does not challenge inmate Burton's contention. *See id.* at 844 ("it remains open to the officials to prove that they were unaware even of an obvious risk to inmate health or safety.").

As to whether Officer Griffith responded reasonably to the threat, after receiving notice from inmate Burton, Officer Griffith did nothing to protect Cunningham. Docs. 37-2 at 5; 39-1 at 2. In fact, there is no indication that he reported the threat, that he searched Grover or his cell for sharp objects that Grover could use as weapons, that he paid closer attention to Cunningham or Grover in the common areas, or that he took any steps to protect Cunningham. Docs. 1 at 5; 39-1 at 2. Instead, allegedly, Officer Griffith told Burton, "[w]hatever happens to you all homosexuals needs to happen . . . ," docs. 1 at 5; 39-1 at 2, and purportedly "abandoned his post" when Grover attacked Cunningham two days later, doc. 37-2 at 22. Based on these allegations, a reasonable jury could find that Officer Griffith failed to act reasonably to protect Cunningham from the substantial risk of serious harm that Grover posed to him.

In sum, a jury could infer from these facts that each individual defendant acted with deliberate indifference to the substantial risk that Grover posed to Cunningham's safety by finding that each subjectively knew of and failed to respond reasonably to that risk.

### 2. Causal Connection

"[T]o state a claim for deliberate indifference under § 1983, there must be a causal connection between the constitutional violation and the state actor's conduct." *Martinez v. Burns*, 459 F. App'x 849, 851 (11th Cir. 2012) (citing *Zatler*

21

*v. Wainwright*, 802 F.2d 397, 401 (11th Cir. 1986) (requiring "proof of an affirmative causal connection between the official's acts or omissions and the alleged constitutional deprivation")). "Such a causal connection may be established by showing that the state actor was personally involved in the acts that resulted in the violation of the constitutional right." *Id.* (citation omitted); *see also Gonzalez v. Reno*, 325 F.3d 1228, 1234 (11th Cir. 2003) ("Supervisory liability . . . occurs either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional violation."). "[T]he inquiry into causation must be a directed one, focusing on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have resulted in the constitutional deprivation." *Zatler*, 802 F.2d at 401 (quoting *Williams v. Bennett*, 689 F.2d 1370, 1380 (11th Cir. 1982)).

Defendants (minus Officer Griffith) argue that there is no causal connection between their actions and the alleged constitutional deprivation, because they did not personally participate in the actions that led to the assault. Doc. 37 at 11–12. However, for the reasons stated more fully in Section III(B)(1), the record belies Defendants' contentions, and warrants a finding that each of them had direct contact with Cunningham and Grover, and personally responded to various altercations between them. *See Zatler*, 802 F.2d at 401. More specifically, first, a

reasonable trier of fact could find that Sergeant Ray's failure to separate Cunningham and Grover in January 2013, *see* doc. 37-2 at 10–11, 13, despite a clear directive from Lieutenant Noe, escalated the hostility between the two and fostered the circumstances that led to the July 7, 2013 attack. Second, even though Lieutenant Noe ordered Sergeant Ray to separate Cunningham and Grover in January 2013, and, in April 2013, instructed another officer to lock Grover in his cell after Grover attempted to attack Cunningham in the shower, there is sufficient evidence to create a jury issue on whether Lieutenant Noe's actions contributed to Cunningham's injuries. As an initial matter, there is no evidence before the court regarding what actions, if any, Lieutenant Noe took to ensure compliance with his directives. Moreover, Lieutenant Noe deliberately refused to heed advice from a fellow lieutenant to place Cunningham or Grover in segregation "until one was released for fear that one or both would be injured or killed." *See id.* at 10 –11, 13, 16–17, 26; *see also* docs. 39 at 7; 39-1.

Third, although Captain Smith witnessed Grover threaten to kill Cunningham, Captain Smith refused Cunningham's request in September 2012 for transfer to a different cell, and in April 2013, refused Cunningham's request for a transfer to a different dorm. Doc. 37-2 at 25–26. Based on these refusals, which left Cunningham open to future attacks, a reasonable jury could find that Captain Smith personally participated in the actions that resulted in the alleged

constitutional deprivation. Finally, although he does not contend otherwise, based on Officer Griffith's dismissive and derogatory response to inmate Burton's report to him that Grover planned to slit Cunningham's throat, *see* doc. 39-1 at 2, a reasonable jury could find a causal connection between Officer Griffith's actions and the attack just two days later.

## IV.    CONCLUSION AND ORDER

For the aforementioned reasons, Defendants' motion for summary judgment, doc. 37, is **GRANTED** as to the claims against Warden Estes, which are **DISMISSED WITH PREJUDICE**. As to all claims against Sergeant Ray, Lieutenant Noe, Captain Smith, and Officer Griffith, the motion is **DENIED**.

**DONE** the 15th day of May, 2017.

_____
**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE